IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

GREAT LAKES REINSURANCE (UK) PLC §
§
    Plaintiff §
§    CIVIL ACTION NO. 4:10-cv-02060
vs. §
§    RULE 9(h) ADMIRALTY
§
TICO TIME MARINE, LLC §
§    JURY DEMANDED
    Defendant §

## DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND COUNTER-MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, **TICO TIME MARINE, LLC,** (hereinafter "Tico Time") Defendant in the

above-entitled and numbered cause of action, and files this its Response to Plaintiff's, Great Lakes

Reinsurance (UK) PLC (hereinafter "Great Lakes"), Motion for Summary Judgment and Counter

Motion for Summary Judgment as to Tico Time's complaint for declaratory judgment , and would

respectfully show unto the Honorable Court as follows:

## I.
## INTRODUCTION / BACKGROUND

1.  This lawsuit arises out of facts and circumstances from the denial and cancellation by Great

Lakes of Tico Time's insurance coverage relating to the accidental sinking of its vessel, M/V TICO

TIME II.

2.  On or about May 5, 2010, the M/V TICO TIME II was docked in Puntarenas, Costa Rica.[1]

In order to make repairs and conduct maintenance on the vessel, the Captain removed the exhaust

---

[1] *See* Exhibit "**1**" at 14, (lns. 6-11)(Condensed Deposition Transcript of Captain William
Michael Hester; Sept. 27, 2011).

riser to repair an exhaust leak at a weld point on the riser.[2] Prior to disassembling the exhaust system, the Captain inserted an inflatable fender/plug used on multiple occasions into the exhaust line leading to the exhaust port to prevent ingress of sea water through the open line.[3] The exhaust port is above or at the water line. As part of the repair, the Captain plugged the exhaust line and removed the riser.[4] After properly securing the boat and ensuring there were no leaks, the Captain took the exhaust riser to be repaired at the nearest facility in Costa Rica located about an hour away from the marina where the vessel was moored.[5] When the Captain returned, M/V TICO TIME II was substantially submerged as a result of the fender being cut from an unknown source.[6]

3.      On May 6, 2010, Tico Time immediately filed a formal claim for its loss with Great Lakes. Without notice, Great Lakes not only wrongfully denied coverage, but also cancelled Tico Time's policy without any valid reason or cause, and filed suit the same day it sent a denial letter to Tico Time on June 11, 2010.[7]

---

[2] *Id.* at 16, (lns. 4-24).

[3] *Id.* at 16, (lns. 18-22); at 21, (ln. 25 - p. 22, ln. 1).

[4] *Id.* at 16, (lns. 18-22).

[5] *Id.* at 16, (lns. 13-17); at 16, (lns. 19-22).

[6] *Id.* at 16, (lns. 22-24); *see also* Exhibit "**2**" at 73, (lns. 16-18); at 76 (ln. 24 - p. 77, ln. 3)(Condensed Deposition Transcript of Douglas Eugene Wager; Dec. 12, 2011); *and* Exhibit "**6**" at 2 (Survey Report by Stewart Hutcheson; May 10, 2010).

[7] *See generally* Exhibit "**3**" (Denial Letter; June 11, 2010); *and compare with* Doc. 1 (Plaintiff's Original Complaint and Request for Declaratory Judgment; filed and entered June 11, 2010).

4.      Great Lake's conduct of denying claims, cancelling policies, and filing suit before the insured is able to respond has been found by the courts in the Southern District of Texas, Houston Division, to be improper "procedural fencing" and such suits have been dismissed.[8]

## II.
## SUMMARY JUDGMENT / COUNTER SUMMARY JUDGMENT EVIDENCE

Exhibit 1 –     Condensed Deposition Transcript of Captain William Michael Hester (Tico Time Captain)

Exhibit 2 –     Condensed Deposition Transcript of Douglas Eugene Wager (Great Lakes' Insurance Adjuster)

Exhibit 3 –     Denial Letter dated June 11, 2010

Exhibit 4 –     Private and Pleasure Yacht Insuring Agreement

Exhibit 5 –     Condensed Deposition Transcript of Beric Anthony Usher (Great Lakes' Corporate Representative)

Exhibit 6 –     Survey Report by Stewart Hutcheson (Great Lakes' Marine Surveyor) dated May 10, 2010

Exhibit 7 –     Condensed Deposition Transcript of Richard "Dick" Frenzel (Tico Time's Marine Surveyor)

Exhibit 8 –     Preliminary Report by Richard "Dick" Frenzel dated April 19, 2011

## III.
## SUMMARY JUDGMENT STANDARD OF PROOF

5.      Summary judgment is improper in this case because there are genuine issues of fact on the following questions in which Great Lakes' cause of action for declaratory judgment is based: 1) whether at the time of the alleged loss, the M/V TICO TIME II was unseaworthy, as the vessel's

---

[8] *See* Great Lakes Reinsurance (UK) PLC v. Spielvogel, No. H-06-0982, 2006 U.S. Dist. LEXIS 39237 (S.D. Tex., 2006) (Memorandum and Order; Judge Ellison presiding).

equipment was temporally rendered unfit for its intended use, proximately causing the vessel's sinking; and 2) whether no fortuity caused the alleged damages to the M/V TICO TIME II.

6.     Although summary judgment is proper in a case where there is no genuine issue of material fact, this is not a case in which the court should grant summary judgment.[9] A plaintiff moving for summary judgment must satisfy its burden by submitting summary judgment proof that establishes all elements of its cause of action as a matter of law.[10] This burden is satisfied only if, after viewing the evidence in the light most favorable to non-movant, no genuine issues of material fact exist and no reasonable trier of fact could find in favor of non-movant.[11]

7.     Accordingly, summary judgment must be denied in Tico Time's favor because there exists disputed issues of material fact that precludes summary judgment.

## IV.
## RESPONSE TO SUMMARY JUDGMENT / COUNTER MOTION FOR SUMMARY JUDGMENT

8.     Great Lakes moves for summary judgment and requests this Honorable Court to declare that no coverage exists under the Policy on the basis that at the time of the loss, the M/V TICO TIME II was unseaworthy, as the vessel's equipment was temporarily rendered unfit for its intended use, proximately causing the vessel's sinking. Alternatively, Great Lakes requests this Court to declare

---

[9] *See* Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

[10] *See* Stewart v. Magnum Transcontinental Corp., 81 F. Supp. 753, 755 (S.D. Tex. 2000).

[11] *See* Fed. R. Civ. P. 56(a); New Par v. City of Saginaw, 301 F.3d 390, 394 (6th Cir. 2002); Jenkins v. Wood, 81 F.3d 988, 990 (10th Cir. 1996); Meadowbriar Home for Children, Inc. v. Gunn, 81 F.3d 521, 533 (5th Cir. 1996); Scott v. Harris, 550 U.S. 372, 378-380 (2007); Cooper Tire & Rubber Co. v. Farese, 423 F.3d 446, 456 (5th Cir. 2005); Garcia v. Pueblo Country Club, 299 F.3d 1233, 1236-37 (10th Cir. 2002); San Pedro v. U.S., 79 F.3d 1065, 1068 (11th Cir. 1996); Irby v. Bittick, 44 F.3d 949, 953 (11th Cir. 1995); Campbell v. Hewitt, Coleman & Assocs., 21 F.3d 52, 55 (4th Cir. 1994).

that no coverage exists under the Policy on the basis that no fortuity caused the alleged damages to

the M/V TICO TIME II.

## A. Tico Time was Seaworthy at time of loss as it was Reasonably Fit for its Intended Use

9.      There exist genuine issues of material fact as to M/V TICO TIME's seaworthiness at the time

of the alleged loss. Therefore, this Court should deny Great Lakes' motion for summary judgment

and alternatively the Court should grant Tico Time's counter motion for summary judgment.

"Seaworthy" is defined in the Policy as follows:

'Seaworthy' means fit for the Scheduled Vessel's intended purpose. Seaworthiness applies not only to the physical condition of the hull, but to all its parts, equipment and gear and includes the responsibility of assigning an adequate crew. For the Scheduled Vessel to be seaworthy, it and its crew must be reasonably proper and suitable for its intended use.[12]

10.     Great Lakes argues that Tico Time's Policy does not cover the loss claimed because Tico

Time breached its warranty of seaworthiness, thereby voiding coverage from the inception of the

Policy. For a vessel to be seaworthy it must be reasonably fit for its intended purpose.[13] In order for

a vessel to be "seaworthy," it has to meet the definition in the Policy, which specifies "For the

Scheduled Vessel to be seaworthy, it and its crew must be reasonably proper and suitable for its

intended use."[14]  Importantly, "whether or not a vessel is in fact seaworthy involves a relative

---

[12] *See* Exhibit "4" at 1, ¶k (Private and Pleasure Yacht Insuring Agreement).

[13]*See* Olsen v. Isbrandtsen Co., 209 F.Supp. 6, 8 (S.D.N.Y. 1962)(citing Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550 (1960); Seas Shipping Co. v. Sieracki, 328 U.S. 85 (1946); Van Carpals v. The S.S. American Harvester, 297 F.2d 9 (2d Cir. 1961), cert. denied, 369 U.S. 865 (1962)).

[14] *See* Exhibit "4" at 1, ¶k (Private and Pleasure Yacht Insuring Agreement).

concept dependent in each particular case upon time, place and other factors."[15] Therefore, "[w]hat

may be seaworth[y] under one set of circumstances may be unseaworth[y] under different

circumstances."[16] Based on the hard facts and evidence attached hereto, only one conclusion can be

reached: There exist genuine issues of fact as to whether the M/V TICO TIME II was seaworthy at

the time of the loss, precluding summary judgment. As a matter of law and fact, the vessel was

seaworthy for its intended use until the subject fender was cut and the vessel accidentally sank.[17]

### 1. Undisputed: Loss of Vessel Caused by Extraordinary Unknown Peril

11.     Although a vessel that sinks in calm waters may be presumed to be unseaworthy, this

questionable presumption is rebutted in this case because "the unexplained sinking and consequent

loss was caused by some extraordinary, although unknown and unascertainable, peril of the sea."[18]

Thus, Great Lakes (the insurer) bears the ultimate burden of proving unseaworthiness.[19] There is no

dispute that it is unknown and unascertainable as to what caused the fender to fail, whether as a

---

[15] *See* Olsen v. Isbrandtsen Co., 209 F.Supp. 6, 8 (S.D.N.Y. 1962)(citing Boudoin v.
Lykes Bros. S.S. Co., 348 U.S. 336 (1955); May v. Hamburg-Amerikanische Packetfahrt
Aktiengesellschaft, 290 U.S.333 (1933); Lester v. United States, 234 F.2d 625 (2d Cir. 1956);
Krey v. United States, 123 F.2d 1008 (2d Cir. 1941); Zinnel v. United States Shipping Board
Emergency Fleet Corp., 10 F.2d 47 (2d Cir. 1925); Henry Gillen's Sons Lighterage, Inc. v.
Fernald, 294 F. 520 (2d Cir. 1923).

[16] *Id.*

[17] *See* Exhibit "**5**" at 28, (lns. 22-25); at 54, (lns. 16-18)(Condensed Deposition Transcript
of Beric Anthony Usher; Oct. 18, 2011).

[18] *See* Insurance Co. Of North America v. Lanasa Shrimp Co., 726 F.2d 688, 690 (11th
Cir. Fla. 1984).

[19] *Id.*

result of a peril of the sea or otherwise. In fact, Great Lakes' own corporate representative and insurance adjuster have testified under oath to the following:

Q: ...[D]oes Great Lakes know at the time they issued this [denial] letter to Mr. Wilkinson how the cut in the fender occurred?

A: No.

Q: Okay. To this date, does Great Lakes know how the cut in the fender occurred?

A: No.[20]

Q: —as far as Great Lakes knows, the cut could have occurred as a result of an event or condition that occurred by chance or arose from unknown or remote causes, correct?

A: We don't know how it happened, so—correct, yes.[21]

Q: Okay, so the cut could have occurred as a result of an unfortunate—an event of unfortunate character that takes—that took place without foresight or expectation.

A: Possibly, yes.[22]

Q: So the failure of the fender is what caused the loss?

A: That's correct.[23]

Q: ..[D]o you know how the cut occurred?

A: That particular cut, I mean, I can't say for certain because I don't know.[24]

---

[20] *See* Exhibit "**5**" at 37, (lns. 10-16)(Condensed Deposition Transcript of Beric Anthony Usher; Oct. 18, 2011).

[21] *Id.* at 38, (lns. 4-8).

[22] *Id.* at 38, (lns. 17-20).

[23] *See* Exhibit "**2**" at 70, (lns. 1-3)(Condensed Deposition Transcript of Douglas Eugene Wager; Dec. 16, 2011).

[24] *Id.* at 73, (lns. 16-18).

Q:  ...Stewart Hutcheson identified in his report on Page 2 under the remarks, says, "The undersigned could not determine how the cut in the fender occurred." You wouldn't have any reason to dispute that, do you?

A:  No.[25]

12.  Accordingly, but for the failure of the fender, the vessel would not have sunk. What further remains undisputed is that it is unknown whether the presence of crew or a watch could have prevented the vessel from sinking.[26] Nevertheless, it was determined by Great Lakes not to be the cause of loss.[27] It is also undisputed that the use of any other suggested equipment in place of the fender would likewise run a risk of failing. Great Lakes does not dispute this:

Q:  Let me ask you on the pneumatic plugs that you attached as part of your supplemental report, whether or not you know if the pneumatic plugs that you included as part of your report are subject to ever failing?

A:  Everything is subject to failing.

Q:  So, would the wooden plugs that you, I guess, discussed with Sonny Middleton, do you know whether or not those wooden plugs would be subject to failing?

A:  Everything is subject to failing.

Q:  So despite what plug you use, it would be subject to failing?

A:  Anything can fail, sir.[28]

---

[25] *Id.* at 76, (ln. 24 - p. 77, ln. 3); *see also* Exhibit "**6**" at 2 (Survey Report by Stewart Hutcheson; May 10, 2010).

[26] *Id.* at 53, (lns. 9-13); *see also* Exhibit "**5**" at 56, (lns. 16-18)(Condensed Deposition Transcript of Beric Anthony Usher; Oct. 18, 2011).

[27] *Id.* at 40, (lns. 15-24); *see also* Exhibit "**2**" at 72, (lns. 8-11)(Condensed Deposition Transcript of Douglas Eugene Wager; Dec. 16, 2011); *and* Exhibit "**6**" at 2 (Survey Report of Stewart Hutcheson).

[28] *See* Exhibit "**2**" at 45, (lns. 10-21)(Condensed Deposition Transcript of Douglas Eugene Wager; Dec. 16, 2011); *see also* Exhibit "1" at p.3, attached thereto (Pneumatic Plugs

**2.    Intended Use:  Fender/Bumper Used as Plug to Float Vessel**

13.    At all material and relevant times, the fender/bumper was being used by Captain Hester for the vessel's intended use, as the vessel was intended to float while being moored in its slip undergoing repairs.  Great Lakes' argument that Captain Hester created an unseaworthy condition by using a fender/bumper for an "unintended purpose" is unsupported by law or fact, and is none other than conclusory, and should be ignored in its entirety.[29]  Specifically, Great Lakes offers no support for its argument that Captain Hester's method of exhaust securement was not proper, thereby rendering the vessel unseaworthy.  In fact, Great Lakes cannot even point to one piece of equipment that is specifically designed and marketed to be used in a marine application for the purpose of plugging exhaust ports.  Notably, the insurance adjuster hired by Great Lakes, who has no formalized training, certification, or licenses to be a marine mechanic,[30] testified:

> Q:    ..and according to your report, I guess, [is] an example of plugs that in your opinion were to be used to plug a marine exhaust for purposes of conducting these type of repairs, correct?
>
> A:    This type of plug–there's no plug that's going to take the place of hauling the vessel out.....they're used more in the plumbing industry than they are certainly in the marine, but they will work for a temporary plug in something while you're working on an exhaust system with the vessel in the water.[31]

---

attachment to Mr. Wager's Supplemental Report).

    [29] *See* Coley v. Michelin Tire Corp., 99 A.D.2d 795, 796 (N.Y. App. Div. 2d Dep't 1984)(conclusory assertions may not serve as a predicate for summary judgment)).

    [30] *See* Exhibit "**2**" at 14, (lns. 1-19)(Condensed Deposition Transcript of Douglas Eugene Wager; Dec. 16, 2011).

    [31] *Id.* at 29, (ln. 12 - p. 30, ln. 1); *see also* Exhibit "1" at p. 3, attached thereto (Pneumatic Plugs attachment to Mr. Wager's Supplemental Report).

Q:    –it is meant for purposes in your opinion to demonstrate a plug that is intended to be used for plugging a marine exhaust hole?

A:    That would be acceptable while conducting repairs while the vessel's attended, yes.

Q:    And that's in your opinion?

A:    Yes, sir.[32]

Q:    ...Can you please identify for me anywhere on that page where it says these plugs are to be used in, or can be used in marine applications?

A:    It does not say that.[33]

A:    This, as I've said, this particular plug is something that Florida Detroit Diesel Allison, who obviously works on marine engines, said that this is something that they utilize in their business while repairing exhaust systems. Okay.

Q:    At a repair facility?

A:    That's correct.[34]

Q:    ...[W]here does it say that these plugs can be used or should be used for plugging an exhaust hole on a vessel?

A:    It's not going to say that there. It doesn't say that there.[35]

14.    All determinations made by Great Lakes were made by consulting repair facilities located

in the United States, despite the vessel being moored in Costa Rica.[36]   Great Lakes took no action

---

[32] *Id.* at 30, (lns. 19-25).

[33] *Id.* at 31, (lns. 9-13); *see also* Exhibit "1" at p.3, attached thereto (Pneumatic Plugs attachment to Mr. Wager's Supplemental Report).

[34] *Id.* at 31, (lns. 17-23).

[35] *Id.* at 32, (lns. 2-5); *see also* Exhibit "1" at p.3, attached thereto (Pneumatic Plugs attachment to Mr. Wager's Supplemental Report).

[36] *Id.* at 88, (lns. 22-24).

to determine the existence or availability of parts or equipment at or near the marina, or even throughout Costa Rica.[37] Nor did Great Lakes contact any boat captains to see whether they ever used fenders as exhaust plugs.[38]

15.     Conversely, fenders (which was used by Captain Hester), are commonly used in the sport fishing community. Specifically, Tico Time's expert Mr. Richard Frenzel has testified:

> A:     Based on my experience in the marine field for over the past 50 years, I have seen them used on numerous cases and seen them available for use on vessels that might be in outlying areas where they were not sitting right at a shipyard or haulout facility.[39]

> Q:     Have you ever recommended to a shipyard or a ship repair company or anybody to use a fender as a means of plugging an exhaust port when the exhaust risers have been removed?

> A:     To a lot of boat owners, I have, yes, because it's a standard operating procedure.

> Q:     Standard operating procedure, where is that said—where is it said that that's a standard operating procedure?

> A:     I don't know where it might be said. It's just commonly done throughout the yacht and sports—I carried spare fenders for that purpose when I was running David Perry's yacht.[40]

> Q:     Tell me along the Gulf Coast what marine repair shops or dry docks use the fender as a plug for open exhaust ports when vessels are in the water.

---

[37] *Id.* at 36, (ln. 23 - p. 37, ln. 5).

[38] *Id.* at 54, (lns. 19-24); at 55 (lns. 1-4).

[39] *See* Exhibit "**7**" at 30, (lns. 1-5)(Condensed Deposition Transcript of Richard "Dick" Frenzel; Nov. 4, 2011).

[40] *Id.* at 17, (lns. 2-14); *see also* Exhibit "**8**" at 4, cmt. 3-4 (Preliminary Report by Richard "Dick" Frenzel; April 19, 2011).

A:   Repair shops and dry docks do not use that, because they haul the vessels out. They are used when you don't have a dry dock or travel lift available for haulout.[41]

16.   Great Lakes acknowledges they would use a fender in certain conditions when no other material was available.[42] It is undisputed that there were not any haul-out facilities, repair facilities or alternative equipment available at the marina, nor were there any accessible shipyards. Furthermore, the nearest repair facility was approximately 25-30 miles (about an hour) away via open water and at an unacceptable risk to the vessel. Great Lakes does not dispute this per its own testimony:

Q:   While you were at the Los Suenos Marina, did you have a chance to observe whether or not there were any haul-out facilities located there at the Los Suenos Marina?

A:   There are none.[43]

Q:   Okay. Did you happen to notice whether or not there existed any sort of mechanics, repair vendors that would fix, for example, exhaust risers?

A:   I don't know.

Q:   Do you know how far away from the Los Suenos Marina the nearest haul-out facility is located?

A:   I understand it's about an hour, or thereabouts, away by boat to the haul-out facility.

---

[41] *See* Exhibit "**7**" at 19, (ln. 24 - p. 20, ln. 5)(Condensed Deposition Transcript of Richard "Dick" Frenzel; Nov. 4, 2011).

[42] *See* Exhibit "**5**" at 36, (lns. 7-17)(Condensed Deposition Transcript of Beric Anthony Usher; Oct. 18, 2011); *and* Exhibit "**2**" at 100, (ln. 23 - p. 101, ln. 2)(Condensed Deposition Transcript of Douglas Eugene Wager; Dec. 16, 2011).

[43] *See* Exhibit "**2**" at 17, (lns. 15-19)(Condensed Deposition Transcript of Douglas Eugene Wager; Dec. 16, 2011).

Q: Do you know about how many miles that would be?

A: My recollection, and I believe there might be something in my report about that, would be around 25 miles by water.[44]

17. Importantly, Great Lakes readily admits the vessel's intended use at the time it was undergoing repair was to float:

Q: So its intended use while it's being repaired isn't to go run out and be operated. The intended use at that time is to get repaired, right?

A: It's under repair at that time, yeah.[45]

Q: Well, its intended use in this particular case was to float, right, while it was being repaired? Certainly you're not going to suggest that the intended use while it was being repaired was to go run offshore and go fishing?

A: No. They were conducting repairs while the vessel was afloat.

Q: Right.

A: I would agree to that.

Q: And while the repairs were being conducted, the intended use of the boat was to remain right where it was so the repairs could be done?

A: I think they had no plans on taking the boat at that point in time, that's correct.[46]

Q: You'd agree with me that aside from being a pleasure or private usage of a boat, as far as the intended purpose of the boat goes, the actual – as long as it fits within pleasure or private, how the boat is actually used is at the discretion of the owner of the boat?

A: I would agree to that.

---

[44] *Id.* at 18, (lns. 3-15).

[45] *Id.* at 83, (ln. 24 - p. 84, ln. 2).

[46] *Id.* at 84, (lns. 5-18).

Q: So if the owner of the boat in his own discretion says I want to leave the boat sitting right where it is, and while it's there I could go down and have a cocktail, or have it repaired, then the owner in his own discretion is exercising how that boat is to be used, correct?

A: If that's how he wants to use the boat.

Q: So if that's the case, then the owner is still using the boat for its intended purpose. It's still a private–

A: If that's what he intended to do with the boat, then I –yes.[47]

### 3. Vessel was Safely Afloat

18. At all material and relevant times, the vessel was safely afloat with no signs of water ingress or reasons for alarm at the time Captain Hester left the marina to have the exhaust riser repaired.[48] Great Lakes argues that by Captain Hester leaving the vessel unattended in its "fragile" condition, serves as an independent cause for rendering the vessel unseaworthy. It is undisputed that there were no requirements for manning the vessel, and even if the vessel were under watch, it is unknown if the leakage and subsequent accidental sinking could have been prevented.[49] In fact, Tico Time's expert has testified that this type of repair is "done all the time without people onboard" while the exhaust riser has been removed.[50] Additionally, Captain Hester testified:

---

[47] *Id.* at 86, (ln. 20 - p. 87, ln. 13).

[48] *See* Exhibit "**1**" at 16, (lns. 21-22)(Condensed Deposition Transcript of Captain William Michael Hester; Sept. 27, 2011).

[49] *See* Exhibit "**2**" at 96, (ln. 17 - p. 97, ln. 1)(Condensed Deposition Transcript of Douglas Eugene Wager; Dec. 16, 2011); *see also* Exhibit "**5**" at 40, (lns. 20-24); at 55, (lns. 7-10); at 56, (lns. 16-18)(Condensed Deposition Transcript of Beric Anthony Usher; Oct. 18, 2011).

[50] *See* Exhibit "**7**" at 16, (lns. 12-19)(Condensed Deposition Transcript of Richard "Dick" Frenzel; Nov. 4, 2011).

A:     ...So I took it [exhaust riser] off, put it in the car, and I put–well, I had put the bumper in prior to that, you know, prior to taking it off. And so I took it off, and then I took the surge tube off. And there was no leakage. Everything was fine. And I left to go get the thing welded up as quick as I could, and then I came back, and, unfortunately, the boat was going down.[51]

Q:     Explain to the court what the bumper was.

A:     The bumper was a standard bumper. It was size 4, I think, which made it just perfect where it would fit in there, and then you'd inflate it enough to seal the hole.[52]

Q:     It's not necessarily a bumper designed to fit into an exhaust hole to keep water out, correct?

A:     I've seen it done an awful lot.[53]

Q:     What did they tell you about what happened during that three-hour period that you were gone?

A:     They said–nothing. They said they looked, it wasn't leaking, so they left.[54]

19.    Furthermore, Great Lakes' Policy does not require manning the vessel around the clock to watch for unknown or unanticipated failures of the boat or its equipment. Great Lakes' insurance adjuster, Mr. Doug Wager, testified the following regarding the Policy:

Q:     Do you see anywhere in the insurance policy, in Exhibit 4, where it requires that the vessel be manned or placed under watch 24 hours, seven days a week?

A:     There is no provision for– in the policy that says that it must be–

---

[51] *See* Exhibit "**1**" at 16, (lns. 18-24)(Condensed Deposition Transcript of Captain William Michael Hester; Sept. 27, 2011).

[52] *Id.* at 17, (lns. 12-16).

[53] *Id.* at 17, (ln. 25 - p. 18, ln. 2).

[54] *Id.* at 21, (lns. 7-10).

Q: Do you see anywhere in the policy where it requires that a vessel be manned or under watch for any period of time while the vessel was undergoing repairs?

A: There's no provision in the policy for that, no requirement.[55]

20. Additionally, Great Lakes' corporate representative, Mr. Beric Usher, testified to the lack of requirements for manning the vessel during repairs:

Q: Where in the policy does it require that when repairs are being made on a vessel, that there's a requirement that somebody has to attend the vessel?

A: I'm—it—there's no specific requirement.[56]

21. Thus, the vessel was not left unattended in a state of disrepair or in a precarious condition. In fact, Captain Hester has used a fender to plug exhaust ports on numerous occasions without the fender ever failing:

Q: Did you give specific instructions to your crew to stay onboard the vessel while this bumper was in place in the exhaust tube?

A: No.

Q: Why not?

A: Because I had done this before, and it had always worked, and they were supposed to be there, anyway.[57]

---

[55] *See* Exhibit "2" at 96, (ln. 17 - p. 97, ln. 1)(Condensed Deposition Transcript of Douglas Eugene Wager; Dec. 16, 2011).

[56] *See* Exhibit "5" at 55, (lns. 7-10)(Condensed Deposition Transcript of Beric Anthony Usher; Oct. 18, 2011).

[57] *See* Exhibit "1" at 21, (ln. 20 - p. 22, ln. 1)(Condensed Deposition Transcript of Captain William Michael Hester; Sept. 27, 2011); *see also* Exhibit "2" at 54, (lns. 10-13)(Condensed Deposition Transcript of Douglas Eugene Wager; Dec. 16, 2011).

22.     Captain Hester could not have known of any defective or fragile condition of the vessel as

Great Lakes attempts to argue, despite the testimony of Great Lakes and its representatives. In fact,

Mr. Wager (Great Lakes' insurance adjuster) admits he did not personally inspect the boat or fender,

and Mr. Hutcheson (Great Lakes' surveyor) never stated in his report to the contrary:

> Q:      Hutcheson didn't identify in his report that the fender was well worn, did he?
>
> A:      No, sir, not to my knowledge.
>
> Q:      So that term of art, if you will, the term "well worn," was your creation or your opinion?
>
> A:      That's my opinion.[58]

23.     In fact, the marina even instructed Tico Time's boat captain to secure the vessel using fenders

after the vessel had sunk and was refloated:

> Q:      Was she in the same condition as she was once you raised her after the May 5th, 2010 incident?
>
> A:      No, we had–we had cleaned her up quite a bit. I had put two more bumpers in there to keep water from going back in, as per the marina's request.
>
> Q:      Bumpers into both exhaust ports?
>
> A:      Yes.
>
> Q:      The same kind of bumpers that you used on May 5th?
>
> A:      Same size, same everything. And they were still there a year later.[59]

---

[58] *See* Exhibit "**2**" at 98, (lns. 16-22)(Condensed Deposition Transcript of Douglas Eugene Wager; Dec. 16, 2011).

[59] *See* Exhibit "**1**" at 27, (lns. 4-15)(Condensed Deposition Transcript of Captain William Michael Hester; Sept. 27, 2011).

24.     A warranty of seaworthiness remains in effect throughout the occurrence of events which proximately cause a sinking when the risk to the vessel was readily capable of being resolved at all times by the simple expedient of maintenance.[60] In this case, maintenance was being performed on the vessel by Captain Hester. However, Great Lakes attempts to argue that the vessel, in its state of disrepair, was in an unseaworthy condition in which the risks of sinking could "easily been avoided by replacing the exhaust riser with a proper plug." Even if a "proper plug" were used, then Great Lakes would equally complain that the vessel was rendered unseaworthy, as Great Lakes admits that a "proper plug" can also fail.[61] Notably, there is no such thing as a "proper plug," as Great Lakes cannot point to any evidence of a plug that is designed and marketed for marine use to plug an exhaust port. Thus, Great Lakes' theory leads to the absurd conclusion that all vessels undergoing repair are rendered unseaworthy simply by virtue of being repaired, thus voiding or breaching every insurance policy.

25.     Because there exists disputed issues of material fact as to whether M/V TICO TIME was unseaworthy at the time of loss, as the vessel's equipment was temporarily rendered unfit for its intended use, proximately causing the vessel's sinking, Great Lakes' motion for summary judgment should be denied, and alternatively the Court should grant Tico Time's counter motion for summary judgment.

---

[60] *See* Underwriters at Lloyd's v. Labarca, 260 F.3d 3, 9 (1st Cir. P.R. 2001).

[61] *See* Exhibit "**2**" at 45, (lns. 10-21); at 48, (lns. 10-20)(Condensed Deposition Transcript of Douglas Eugene Wager; Dec. 16, 2011).

## B.    Fortuity/Accident Not Defined

26.    In the alternative, Great Lakes argues coverage is not afforded Tico Time under the Policy because the loss was not fortuitous/accidental. Fortuitous events are "accidents or casualties of the sea, unforeseen and unexpected events."[62] Nevertheless, such definition does not appear in the insurance policy, otherwise placing the insured on notice of what may or may not constitute an "accident." It cannot be reasonably supported that due to the insurer's own omission of "accident" from the Policy it drafted, it is afforded unbridled discretion to pick and choose at will, as to what constitutes an accident and what does not.

27.    A "loss due to the negligence of the insured or his agents has generally been held to be fortuitous and, absent express exclusion, is covered by an all risks policy."[63] In other words, a loss is fortuitous unless it results from an "inherent defect in the property, ordinary wear and tear, or intentional misconduct on the part of the insured."[64] A fortuitous event has also been described by courts as "an event which so far as the parties to the contract are aware, is dependent on chance. It may be beyond the power of any human being to bring the event to pass."[65] In this case, the failure

---

[62] *See* Axis Resinsurance Co. v. Resmondo, No. 8:08-cv-569-T-33TBM, 2009 U.S. Dist. LEXIS 46441, at *5 (M.D. Fla. June 2, 2009)(citing Int'l Ship Repair & Marine Servs., Inc. v. St. Paul Fire & Marine Ins. Co., 944 F. Supp. 886, 893 (M.D. Fla. 1996).

[63] *See* Royal Ins. Co. of Am. v. Deep Sea Int'l, No. 02 Civ. 3175 (KMW)(FM), 2006 U.S. Dist. LEXIS 18992, at *36 (S.D.N.Y. Mar. 24, 2006)(quoting CPH Int'l, Inc. v. Phoenix Assur. Co., 1994 U.S. Dist. LEXIS 7751, No. 92 Civ. 2729 (SS)(NRB), 1994 U.S. Dist. LEXIS 7751, 1994 WL 259810, at *8 (S.D.N.Y. June 9, 1994)(quoting Goodman v. Fireman's Fund Ins. Co., 600 F.2d 1040, 1042 (4th Cir. 1979)).

[64] *Id.* (citing Goodman, 600 F.2d at 1042.

[65] *See* Morrison Grain Company v. Utica Mutual Insurance Co., 632 F.2d 424, 430 (5th Cir. 1980)(citing the Restatement of Contracts §291, Comment (a)).

of the fender is/was: 1) unforeseen; 2) an unexpected event; 3) unrelated to the condition of the hull; 4) was dependent on chance; and 5) was beyond the power of any human being to prevent. In fact, the sworn testimony taken by both parties supports this:

A:    ...I had put the bumper in prior to that, you know, prior to taking it off. And so I took it off, and then I took the surge tube off. And there was no leakage. Everything was fine.[66]

Q:    What did they [crew members] tell you about what happened during that three-hour period that you were gone?

A:    They said–nothing. They said they looked, it wasn't leaking, so they left.[67]

Q:    Did you give specific instructions to your crew to stay onboard the vessel while this bumper was in place in the exhaust tube?

A:    No.

Q:    Why not?

A:    Because I had done this before, and it had always worked, and they were supposed to be there, anyway. You know, they have certain hours they were supposed to work.[68]

Q:    –as far as Great Lakes knows, the cut could have occurred as a result of an event or condition that occurred by chance or arose from unknown or remote causes, correct?

A:    We don't know how it happened, so–correct, yes.[69]

---

[66] *See* Exhibit "**1**" at 16, (lns. 19-22)(Condensed Deposition Transcript of Captain William Michael Hester; Sept. 27, 2011).

[67] *Id.* at 21, (lns. 7-10).

[68] *Id.* at 21, (ln. 20 - p. 22, ln. 3); *see also* Exhibit "**8**" at 4, cmt. 3-4 (Preliminary Report by Richard "Dick" Frenzel; April 19, 2011).

[69] *See* Exhibit "**5**" at 38, (lns. 4-8)(Condensed Deposition Transcript of Beric Anthony Usher; Oct. 18, 2011).

Q:    Okay, so the cut could have occurred as a result of an unfortunate–an event of unfortunate character that takes–that took place without foresight or expectation.

A:    Possibly, yes.[70]

Q:    And he [Stewart Hutcheson] was required to report back his – to base on his observations as to what the cause of loss was.

A:    Correct.

Q:    Okay. As part of your trained, hired marine surveyor that you sent down via your chain of folks to – to inspect the vessel, nowhere did your surveyor identify the cause of loss in any of his reports as being the use of a fender –

A:    No.

Q:    – correct?

A:    What he said was that the fender had been used, it became damaged, and that's how the water g[o]t in.

Q:    Okay. And he further remarked that he could not determine how the fender became damaged.

A:    Correct.

Q:    Okay. Or in – specifically, how the cut in the fender occurred.

A:    Correct.[71]

Q:    ...[I]t's based on speculation that if somebody were in attendance, that the loss could have been prevented?

A:    Oh, absolutely, yes.[72]

---

[70] *Id.* at 38, (lns. 17-20).

[71] *Id.* at 34, (ln. 17 - p. 35, ln. 8); *see also* Exhibit "**8**" at 4 (Preliminary Report by Richard "Dick" Frenzel; April 19, 2011).

[72] *See* Exhibit "**5**" at 56, (lns. 16-18)(Condensed Deposition Transcript of Beric Anthony Usher; Oct. 18, 2011).

Q:     Okay. And the vessel itself was reasonably and proper and suitable for its
       intended use.

A:     Yes.[73]

28.    Great Lakes admits that nowhere in the Policy does it define "accident" and/or "fortuitous."

When asked where in the policy the word "accident" or "accidental" is defined, Great Lakes

insurance adjuster states, "I don't believe there's an actual definition in this policy..."[74] Again, when

asked where in the Policy it says that something is not an accident because it was not fortuitous,

which is stated in the denial letter as a reason for denial of coverage,[75] Great Lakes insurance adjuster

responds, "Those words the way that you're reading it, they're not here...The policy says that it

provides coverage for accidental losses."[76] Even Great Lakes' corporate representative admits there

is no definition of "accident" and/or "fortuitous."[77] Rather, Great Lakes creates its own definition

to suite its own benefit as each situation arises. Notably, Great Lake's own insurance adjuster

implies it does not know what the definition of seaworthy is. At first, Mr. Wager suggests that you

can run the vessel at sea with a broken engine in violation of the "fit equipment" element, but then

changes his story that the boat was not seaworthy because the proper plug was not used.[78]

---

[73] *Id.* at 54, (lns. 16-18).

[74] *See* Exhibit "**2**" at 56, (lns. 15-20)(Condensed Deposition Transcript of Douglas
Eugene Wager; Dec. 16, 2011).

[75] *See* Exhibit "**3**" at 2 (Denial Letter; June 11, 2010).

[76] *See* Exhibit "**2**" at 58, (lns. 3-14)(Condensed Deposition Transcript of Douglas Eugene
Wager; Dec. 16, 2011).

[77] *See* Exhibit "**5**" at 22, (ln. 14 - p. 23, ln. 6); at 23, (lns. 17-19); at 24, (lns. 2-
11)(Condensed Deposition Transcript of Beric Anthony Usher; Oct. 18, 2011).

[78] *See* Exhibit "**2**" at 42, (ln. 19 - p. 44, ln. 11); at 29, (ln. 12 - p. 30, ln. 1); at 30, (lns. 19-
25); at 31,(lns. 9-13); at 32, (lns. 2-5); at 36 (lns. 9-15); at 36, (ln. 23 - p. 37, ln. 5)(Condensed

29.     Furthermore, Tico Time's loss was fortuitous because it was one in which could not have reasonably been foreseen by the parties at the time the policy was issued.[79] At the time the Policy was issued, it could not have been reasonably foreseen that the fender would fail. Otherwise, the insurer (Great Lakes) would have addressed such an issue and foreseeable event in the policy it drafted. Great Lakes does not dispute this.

30.     Interestingly, Great Lakes represents to the Court that the loss at issue was not fortuitous because Captain Hester's actions were "intentional," although Great Lakes corporate representative and insurance adjuster prove this to be none other than a false argument:

Q:      Is it Great Lakes' position in this case that the deflation of the fender was not an accident-

A:      No.

Q:      -or the cause of what caused the fender to deflate was not an accident?

A:      To the extent we're not suggesting that the fender was deliberately deflated, presumably accidently deflated...[80]

Q:      Okay. Do you see anywhere in Stewart Hutchenson's reports where Stewart Hutcheson says that this loss was the result of a deliberate act?

A:      No.[81]

Q:      Does Mr. Hutcheson in his report pertaining to what he identified as the cause of loss, the delvelopment of a 1-inch cut deflating the fender–does he say

---

Deposition Transcript of Douglas Eugene Wager; Dec. 16, 2011).

[79] *See* Underwriters Subscribing to Lloyd's Ins. No. 50520 v. Magi, Inc., 790 F.Supp. 1043 (E.D. Wash. 1991).

[80] *See* Exhibit "**5**" at 43, (lns. 17-23)(Condensed Deposition Transcript of Beric Anthony Usher; Oct. 18, 2011).

[81] *Id.* at 37, (lns. 3-6); *see also* Exhibit "**2**" at 88, (ln. 25 - p. 89, ln. 3)(Condensed Deposition Transcript of Douglas Eugene Wager; Dec. 16, 2011).

anywhere in there that somebody intentionally placed a 1-inch cut in the fender, causing the fender to deflate?

A:     No. Only states that the–the fender was intentionally stuffed into the transom tailpipe.

Q:     Okay. At any point in time, does Mr. Hutcheson in any of his reports ever identify that the fender was intentionally cut?

A:     No.

Q:     And just to put it maybe a little differently, is there anywhere in any of Mr. Hutcheson's reports that the fender was intentionally caused to deflate?

A:     No.[82]

Q:     Do you see anywhere in Mr. Hutcheson's report under his cause of loss section where he identifies that the fender was intentionally caused to deflate?

A:     No, he doesn't say it was intentionally–he said, if I recall right, he said the origin of the cut was undetermined.

Q:     Okay. As you sit here today, is it your position that the fender was intentionally caused to deflate?

A:     I don't know the origin of that cut.[83]

Q:     Is it your opinion or testimony in this case that Captain Hester should have known that the fender he used was going to fail?

A:     I don't believe he thought that fender was going to fail.[84]

---

[82] *See* Exhibit "**5**" at 41, (ln. 21 - p. 42, ln. 10)(Condensed Deposition Transcript of Beric Anthony Usher; Oct. 18, 2011).

[83] *See* Exhibit "**2**" at 97, (ln. 18 - p. 98, ln. 3)(Condensed Deposition Transcript of Douglas Eugene Wager; Dec. 16, 2011).

[84] *Id.* at 102, (lns. 17-21).

31.     Because there exists disputed issues of material fact as to whether no fortuity caused the

alleged damages to M/V TICO TIME II, Great Lakes' motion for summary judgment should be

denied, and alternatively the Court should grant Tico Time's counter motion for summary judgment.

## V.
## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant, TICO TIME MARINE, LLC,

respectfully requests that this Court deny Plaintiff's, Great Lakes Reinsurance (UK) PLC, Motion

for Summary Judgment, and alternatively grant Defendant's Counter Motion for Summary Judgment

as to its complaint for declaratory judgment, any other relief, general or special, at law or in equity,

to which Defendant may show itself to be justly entitled.

Respectfully submitted,

THE COLLINGS LAW FIRM, PLLC

By: _____

Chris D. Collings
Texas Bar No. 24036382
Southern District Bar No. 34249
Tanya Y. Niblett
Texas Bar No. 24065823
Southern District Bar No. 973363
440 Louisiana Street, Suite 1450
Houston, Texas 77002
Telephone: (713) 337-1180
Fax: (713) 337-1179

ATTORNEYS IN CHARGE FOR
DEFENDANT TICO TIME MARINE, LLC

## CERTIFICATE OF SERVICE

I hereby certify that service of the foregoing was on this date automatically accomplished on all known Filing Users through the Notice of Electronic Filing. Service on any party or counsel who is not a Filing User was accomplished via Email, Facsimile, Certified Mail/RRR or U.S. First Class Mail, in accordance with the Federal Rules of Civil Procedure on this the 13th day of January, 2012.

Timothy W. Strickland
Mark E. Lewis
Fowler Rodriguez Valdez-Fauli
4 Houston Center, Suite 1560
1331 Lamar
Houston, Texas 77010

Tanya Y. Niblett